**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

    **Plaintiff**,

        **v.**                    **CRIMINAL NO.** 09-269 (FAB)

WILLIAM RODRIGUEZ-RODRIGUEZ,

    **Defendant.**

**OPINION AND ORDER**

BESOSA, District Judge.

On October 26, 2009, following four days of trial, a jury convicted William Rodriguez-Rodriguez ("Rodriguez") of forcibly assaulting or resisting or opposing or impeding or intimidating or interfering with an officer or employee of the United States in violation of Title 18, United States Code, Section 111. (Docket No. 55) Subsequently, on December 16, 2009, Rodriguez filed a motion for judgment of acquittal and a motion for a new trial. (Docket Nos. 78 & 79) On December 24, 2009, the United States filed its opposition. (Docket No. 82)

Rodriguez bases his motion for a new trial on three grounds: (1) the Court bolstered, or "vouched for", the testimony of the government's primary witness; (2) the Court erred in admitting evidence that Rodriguez was under investigation for fraud related to deviation from his delivery route as a postal worker; and (3) the Court erred by refusing to give Rodriguez's preferred self-defense instruction to the jury. (Docket No. 78) Rodriguez bases

his motion for a judgment of acquittal based solely on sufficiency of the evidence grounds.  The Court will first decide whether it engaged in any conduct that could be considered bolstering the government witness's testimony.  It will next review the challenged testimony to decide what was properly admissible.  Then, the Court will examine whether Rodriguez was entitled to his preferred jury instruction on self-defense.  Once the Court has established the procedural integrity of the trial, it will recount the appropriate factual background and conduct a sufficiency review of the evidence properly presented to the jury.  See U.S. v. Aviles-Colon, 536 F.3d 1, 13 (1st Cir. 2008).  For the following reasons, the defendants' motion for a new trial and motion for a judgment of acquittal are **DENIED.**

## I.   Legal Standards and Analysis

### A.   Motion for a New Trial

Federal Rule of Criminal Procedure 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.R.Crim.P. 33(a).  Rodriguez alleges three grounds in his motion for a new trial, all of which deal with some aspect of the trial's procedural integrity.[1]  (See Docket

---

[1] Although sufficiency of the evidence arguments may be presented in a Rule 33 motion for a new trial, Rodriguez confines his challenges to the sufficiency of the evidence presented at trial to his motion for a judgment of acquittal pursuant to Rule 29.

No. 78)  The Court considers each of Rodriguez's grounds for a new trial separately.

### 1.   "Vouching" Allegations

Rodriguez argues that the Court vouched for the Government's primary witness on three occasions.  Specifically, Rodriguez claims that the Court made statements during the testimony of Agent Rafael Peñon ("Agent Peñon") that appeared to lend credibility to that testimony.  (Docket No. 78 at 2-8)  After reviewing the transcripts of Agent Peñon's testimony, the Court finds that no such "vouching" occurred.

The First Circuit Court of Appeals has held that "[a] judge is not a mere umpire:  he is 'the governor of the trial for the purpose of assuring its proper conduct.'"  United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988) (citing Quercia v. United States, 289 U.S. 466 (1933)).  A district judge is not expected to be a "bloodless automaton" and "[c]harges of partiality should be judged not on an isolated comment or two, but on the record as a whole."  Id. (citing United States v. Twomey, 806 F.2d 1136, 1140 (1st Cir. 1986); United States v. Welch, 745 F.2d 614, 621 (10th Cir. 1984), cert. denied, 470 U.S. 1006 (1985); United States v. Billups, 692 F.2d 320, 327 (4th Cir. 1982), cert. denied, 464 U.S. 820 (1983)); see also United States v. DeCologero, 530 F.3d 36, 56 (1st Cir. 2008).  Although "litigants are entitled to a fair trial, . . . [it need not be] a perfect or monochromatic one."  Id.

Criminal No. 09-269 (FAB)                                              4

Furthermore, "[a] judge has wide discretion to interject questions in order to throw light upon testimony or expedite the pace of a trial." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997) (citing Deary v. City of Gloucester, 9 F.3d 191, 194-95 (1st Cir. 1993); United States v. Olmstead, 832 F.2d 642, 648 (1st Cir. 1987), *cert. denied*, 486 U.S. 1009 (1988)).

### First Alleged Incident of "Vouching"

Rodriguez first argues that the Court bolstered Agent Peñon's credibility by allowing a line of questioning regarding Agent Peñon's family, specifically his wife. Preceded by general background questioning regarding Agent Peñon's work history with the United States Postal Service, the alleged incident of bolstering transpired as follows:

[Questioning during direct examination by the government]

Q.   Are you married?

A.   Yes.

Q.   How long have you been married?

A.   Two years.

Q.   Two or 20 you said?

A.   Two years.

Q.   Do you have any children?

A.   Yes.

          MR. GONZALEZ-BOTHWELL[2]: Objection, Your Honor,

relevance.

          THE COURT:  We want to hear about Mr. Peñon.

          MR. GONZALEZ-BOTHWELL:  What they're doing,

Your Honor, is bolstering Mr. Peñon's credibility

by use of his family, Your Honor.

          THE COURT:  Overruled.  Overruled.

BY MR. CONTRERAS[3]:

     Q.   Do you have any children?

     A.   Yes, from my prior marriage.

     Q.   So this is your second marriage?

     A.   Yes.

     Q.   Do you have children with your current

          marriage?

     A.   No.

     Q.   How many children do you have in your previous

          marriage?

     A.   One.

     Q.   How old is that child by the way?

     A.   15 and a half.

     Q.   Your current wife, what does she do?

---

[2] Mr. Gonzalez-Bothwell is one of the attorneys who represented
Rodriguez at trial.

[3] Mr. Contreras represented the government at trial.

> A.   She's a special agent for the OIG.
>
> Q.   So you guys work together?
>
> A.   Sometimes.
>
> Q.   And just because it will be relevant later, what is her name?  Not her married name.  Her maiden name.
>
> A.   Special Agent Anibel Bulillera (ph).

(Docket No. 65 at 42-44)

The context of this line of questioning reveals that the information gleaned related to Agent Peñon's general background.  The testimony immediately prior to the questions about his family related to his age, height, and employment record with the United States Postal Service.  Id. at 40-42.  The testimony that follows Agent Peñon's identification of his wife as an OIG special agent does not stray any further into his family life, but transitions directly into the investigation of Rodriguez preceding the confrontation between Rodriguez and Agent Peñon.  Id. at 44-46. Considering the context of the contested testimony and its brevity, the prejudicial effect caused by any alleged bolstering of Agent Peñon's credibility, if any, appears minimal.

Rodriguez argues that mentioning Agent Peñon's wife's position as an OIG special agent was a further attempt to bolster Agent Peñon's credibility.  (Docket No. 78 at 3)  If Agent Peñon's later testimony is examined, however, Agent Peñon's wife's

status as an OIG special agent becomes additionally relevant. Shortly after the contested testimony, Agent Peñon states that his wife was the OIG special agent that initially received a complaint against Rodriguez, which was eventually referred to Agent Peñon for investigation. (Docket No. 65 at 45-46) Considering Agent Peñon's subsequent testimony, it is clear that Agent Peñon's testimony regarding his wife did not bolster Agent Peñon's credibility, but set the context for the subsequent narrative regarding Agent Peñon's investigation of Rodriguez.

Rodriguez also argues that the Court "emphasized the that [sic] said line of questioning was important to the Court" when the Court stated "We want to hear about Mr. Peñon." (Docket No. 78 at 3; Docket No. 65 at 43) This single comment does not reflect any bias or opinion regarding the Court's opinion as to Agent Peñon, but rather reflects the Court's effort to resolve an objection made by defendant's counsel and put the trial back on course after the resolution of said objection.

**Second Alleged Incident of "Vouching"**

Rodriguez argues that the Court "vouched for" Agent Peñon's testimony by referring to Agent Peñon's thirty-one years of service in various positions with the Postal Service. (Docket 78 at 4) The exchange referred to defendant by appears in the transcript as follows:

[Questioning during direct examination by the government]

Q.    Now based on your training, experience, and
      knowledge of regulations, is a person supposed
      to stay within their route, a postal letter
      carrier?

A.    Yes.

Q.    Based on your knowledge of the regulations,
      rulings and regulations of the Postal Service,
      is a person allowed to go to their home during
      business hours?

A.    No.

Q.    Based on your investigation of this case, was
      --

      MR. GONZALEZ-BOTHWELL:  Objection, Your Honor.
And I'm making the objection to the last two
questions.   It goes beyond the scope of this
witness.   He is not an expert in rules and
regulations.  He is just a Postal Inspector.  He is
just a Postal Inspector.

      There is no foundation as to whether he knows
all the rules and regulations or can give opinions
about the rules and regulations as part of his 31
years in the Postal Service, Your Honor.

      THE COURT:   Or probably because of his 31
years in the Postal Service and nature of his

> duties, he knows what letter carriers should and
> should not do.  Overruled.

(Docket No. 65 at 49-50)

First, it was defendant's counsel, not the Court, who first referenced Agent Peñon's thirty-one years of service when objecting to his testimony.  Second, the Court's comment merely explained the rationale for its ruling on defendant's objection to the government's line of questioning.  It does not indicate any partiality or establish the Court's view of Agent Peñon's credibility, but rather explains Agent Peñon's foundation of personal knowledge as to the specific violations of the rules and regulations of the United States Postal Service for which Rodriguez was being investigated at the time.

### Third Alleged Incident of "Vouching"

Rodriguez argues that the Court "vouched" for Agent Peñon's testimony during the government's redirect examination regarding the basis for Agent Peñon's investigation of Rodriguez. (Docket No. 78 at 5)  In the midst of arguments between both parties regarding the admissibility of Agent Peñon's testimony that he was investigating Rodriguez for a criminal matter, the Court stated "[l]et's put it this way.  He's using government property for personal business."  (Docket No. 65 at 132)  Rodriguez argues that the Court's statement lends credibility to the Agent Peñon's testimony on the matter.  (Docket No. 78 at 5)

This statement must be viewed in the context of defendant's objection to Agent Peñon's testimony that Rodriguez had committed fraud. Defendant's counsel stated "[o]bjection. He is not a lawyer and can't interpret the law." In that context, the Court's statement does not reveal a bias toward the government. Instead, the Court's statement paraphrased the legal allegations being discussed, simplifying testimony for the jury and avoiding the danger that the jury interpret Agent Peñon's testimony as a conclusion of law.

Furthermore, the record reveals that the redirect examination on the potentially criminal nature of Rodriguez's conduct only occurred because defendant's counsel asked during cross examination whether a letter carrier deviating from his route was a criminal matter. (Docket No. 65 at 125-26) The Court ruled during the trial, and reiterates here, that defendant "'open[ed] the door'" to the potentially criminal nature of Rodriguez's conduct prior to the confrontation with Agent Peñon, and the government was entitled to clarify that testimony in its redirect examination of the witness. See United States v. Marin, 523 F.3d 24, 29 (1st Cir. 2008) (quoting United States v. Catano, 65 F.3d 219, 226 (1st Cir. 1995)).

**Cautionary Jury Instructions**

Even if prejudice resulted from any of the alleged incidents of "vouching," the Court took proper action to mitigate

any prejudicial effect.  The First Circuit Court of Appeals has stated that "[i]n assessing the impact of a judge's actions, jury instructions can be a means of allaying potential prejudice." Logue, 103 F.3d at 1046-47 (citing Polito, 856 F.2d at 419).  In the present case, the Court clearly instructed the jury that they "should not infer or conclude from any ruling or other comment I may make that I have any opinions on the merits of the case favoring one side or the other.  I do not favor one side or the other."  (Docket No. 65 at 16)  Regarding the credibility of witnesses, the Court also informed the jury of their responsibility to "decide which witnesses to believe and which facts are true" and instructed them that they must "judge the credibility of all witnesses fairly and reasonably."  (Docket No. 68 at 8)  Thus, even if any of the three exchanges alleged by defendant constituted "vouching", the Court's clear instructions to the jury regarding credibility and impartiality sufficiently mitigated any potential prejudice.  See Logue, 103 F.3d at 1046-47 (citing Polito, 856 F.2d at 419).  Accordingly, defendant's motion for a new trial on the grounds of improper vouching by the Court is **DENIED**.

    **2.   Evidence Related to Peñon's Investigation of Rodriguez**

       Rodriguez claims that the Court erred by allowing Agent Peñon to testify about his investigation of Rodriguez for deviating from his route to spend time at Rodriguez's house. (Docket No. 78 at 8)  Rodriguez argues that testimony relating to

that investigation does not have sufficient probative value to outweigh its prejudicial effect and should have been excluded pursuant to Federal Rule of Evidence 403.  Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Although it is possible that Rodriguez's alleged fraudulent activity could place Agent Peñon's testimony within the ambit of Rule 404(b), Rodriguez "does not make a specific claim that the evidence admitted did not serve a Rule 404(b) purpose." United States v. Charles, 456 F.3d 249, 256 (1st Cir. 2006); Fed.R.Evid. 404(b). Rodriguez only "argues that [Agent Peñon's testimony's] prejudicial nature outweighed its probative value, an inquiry common to both Rule 403 and Rule 404(b) claims." Id.

        Under either standard, the Court finds that admitting the contested testimony was proper.  Agent Peñon's investigation of Rodriguez for deviating from his route and visiting his home during work hours immediately prior to the confrontation that lead to Rodriguez's arrest is an essential part of the narrative of that incident.  The confrontation between Agent Peñon and Rodriguez simply would not have occurred if Agent Peñon had not been investigating Rodriguez at his residence.

        Thus, the probative value of that testimony was high.  It was necessary for the government to introduce Agent

Peñon's testimony regarding his investigation of Rodriguez in order to establish that Agent Peñon was engaging in his official duties, which is an essential element of the crime charged in the indictment.[4]   See United States v. Charles, 456 F.3d 249, 256-57 (1st Cir. 2006) (affirming a district court's admission of a defendant's other illicit activities when necessary to prove that a victim was engaging in official duties for the purposes of 18 U.S.C. § 111).   Even if the testimony were prejudicial, the Court limited any prejudicial effect of this testimony by cautioning the jury that Rodriguez was "not on trial for any act or offense not alleged in the indictment."

Given the high probative value of the testimony to one of the essential elements of the crime charged and the cautionary instruction given to the jury, the Court finds that admitting the testimony regarding Agent Peñon's investigation of Rodriguez was proper.   Accordingly, the motion for a new trial based on these grounds is **DENIED**.

---

[4] Rodriguez spends a substantial amount of time throughout both his motion for a new trial and his motion for acquittal arguing that Agent Peñon had no reason or authority to detain or arrest Rodriguez at the time of the confrontation.   As will be discussed later, these arguments are largely irrelevant.   The First Circuit Court of Appeals has made it abundantly clear that the exercise of official duties is not synonymous with constitutional authority for action.   See United States v. Troy, 583 F.3d 20, 24-25 n.3 (1st Cir. 2009).

### 3.   "Self-Defense" Jury Instruction

Rodriguez requested the Court to instruct the jury with one of the two following jury instructions:

Defendant's Proposed Jury Instruction #7

The Court instructs the jury that if you believe from the evidence in this case that: the defendant, [Rodriguez], on July 29, 2009 had a right to leave the area where he was stopped by Agent Rafael Peñon, as he was never seized, placed under custody, detained or arrested; that Agent Pena touched Mr. Rodriguez without his permission, in an attempt to prevent him from leaving; that Mr. Rodriguez was lawfully justified to use any force to protect himself from Pena [sic], as long as said force was reasonably necessary under the circumstances and not excessive. Then you must enter a verdict of not guilty.

Defendant's Proposed Jury Instruction # 8

The Court instructs the jury that if you believe from the evidence in this case that Agent Peñon, while in the discharge of his official duties, committed assault or battery upon defendant, [Rodriguez], in such a manner as to induce in the mind of the defendant a reasonable, well-founded basis that he was actually in danger of receiving bodily injury and that in an attempt to defend himself and prevent himself from receiving bodily injury, the defendant, [Rodriguez], did resist the assault and battery upon his person, in such case, you should find the defendant not guilty.

(Docket No. 50)

The Court instead addressed the jury with the following instruction regarding self-defense:

Jury Instruction # 17
Self-Defense

In regard to the crime of forcibly assaulting, or resisting, or opposing, or impeding, or intimidating, or interfering with a federal officer or employee as alleged in Count One of the indictment, the Defendant asserts

that he was acting in self-defense.  If the Defendant did not know the official status of the person forcibly assaulted, or resisted, or opposed, or impeded, or intimidated, or interfered with, and if the Defendant honestly believed that he was being attacked, the Defendant would be allowed to use reasonable force to defend himself.  The Defendant, however, may not use more force than is necessary to defend himself.

The Government may answer this defense and sustain its burden of proof for the crime of forcibly assaulting, or resisting, or opposing, or impeding, or intimidating, or interfering with a federal officer or employee, if, in addition to proving the five essential elements of the offense charged as previously given to you, the Government also proves, beyond a reasonable doubt, one of the following two propositions:

One, at the time of the conduct charged in Count One of the indictment, the Defendant actually knew that the individual identified in the indictment as a federal officer or employee was a government officer or employee, or
Two, the force used by the Defendant was excessive and would not have been justified even if the person identified in the indictment as a federal official or employee was a private citizen and not a federal officer or employee.

The Government must prove beyond a reasonable doubt that the defendant did not act in lawful self-defense.

"[The] [C]ourt [of Appeals for the First Circuit] has held that failure to give a requested jury instruction is reversible error only if the requested instruction is substantially correct, was not actually covered in the instruction given and covers an important point in the trial so that the failure to give it seriously impaired the defendant's ability to present a given defense." U.S. v. Nason, 9 F.3d 155, 166 (1st Cir. 1993) (citing U.S. v. Newton, 891 F.2d 944, 949 (1st Cir. 1989)).  A defendant is

typically entitled to an instruction on his theory of defense "as long as it is legally valid and there is sufficient evidence, viewed in the light most favorable to the defendant, to permit a reasonable juror to credit the defendant's theory." United States v. Josleyn, 99 F.3d 1182, 1194 (1st Cir. 1996) (citing United States v. Flores, 968 F.2d 1366, 1368-69 (1st Cir. 1992); United States v. Shenker, 933 F.2d 61, 65 (1st Cir. 1991)). "Nevertheless, the trial court need not adopt the precise instructional language proposed by the defendant." Id. (citing United States v. DeStefano, 59 F.3d 1, 3 (1st Cir. 1995)).

        In this case, the Court's instructions adequately covered the theory of self-defense as it is applicable in cases involving the alleged violation of 18 U.S.C. § 111.  In that particular context, once the defendant asserts that he was acting in self-defense, the government must additionally prove either: (1) that the defendant knew of the official status of the victim; or (2) "that the defendant's use of . . . force would not have qualified as self-defense even if the [victim] had been a private citizen." United States v. Wilk, 572 F.3d 1229, 1238 (11th Cir. 2009) (citing United States v. Alvarez, 755 F.2d 830, 847 (11th Cir. 1985)); United States v. Perkins, 488 F.2d 652, 654-55 (1st Cir. 1973).  The Court's instruction informed the jury that the theory of "self-defense" was an available defense to the charges in the indictment and alerted them to the government's burden to

respond to this defense by either proving defendant's knowledge of the Peñon's official status or the excessive nature of Rodriguez's use of force.

Both of Rodriguez's proposed instructions fail to cover adequately the legal standard for asserting "self-defense" in the particular context of 18 U.S.C. § 111. His proposed instructions appear to cover only a general theory of self-defense, without any reference to the government's burden to prove additional elements to overcome the defense. Neither instruction addresses whether defendant knew of Peñon's official status. Thus, if Rodriguez did know of Peñon's official status, the factual and legal circumstances described in Rodriguez's proposed jury instructions would be insufficient to find Rodriguez not guilty of violating 18 U.S.C. § 111.

The Court finds that the instructions given to the jury in this case on self-defense, as well as the Court's refusal to include defendant's proposed jury instructions on that issue, were proper. Therefore, the motion for a new trial on the grounds that the Court improperly instructed the jury is **DENIED**.

B.   **Motion for a Judgment of Acquittal**

1.   **Factual Background**

The Court does not rehash the entire trial here. Rather, the Court provides at this stage a general description of the events leading to Rodriguez's arrest to bring defendant's

grounds for acquittal into a workable perspective.  See U.S. v. Stierhoff, 549 F.3d 19, 21 (1st Cir. 2008).  Additional background information or facts may be added in the Court's subsequent legal analysis of particular issues as needed.  The Court conveys the facts throughout the opinion in the light most favorable to the verdict.  U.S. v. Rodriguez-Marrero, 390 F.3d 1, 6 (1st Cir. 2004).

        At the time of the events leading to Rodriguez's prosecution, Agent Peñon was a special agent for the Office of Inspector General ("OIG"), United States Postal Service.  Agent Peñon had been employed with the United States Postal Service for approximately 31 years.  He has been an OIG special agent since April of 2006.  As part of his duties, Agent Peñon has the responsibility to investigate fraud perpetrated by other United States Postal Service employees.  He is authorized to carry a firearm, serve subpoenas, and make arrests.  Agent Peñon is married to another OIG special agent.

        In April of 2009, Agent Peñon's wife received a complaint alleging that Rodriguez was deviating from his postal route.  The complaint was from a neighbor who observed Rodriguez at his home during his working hours.  Agent Peñon was eventually assigned to investigate the complaint because the alleged behavior violates Postal Service regulations. Postal Service regulations do not allow a letter carrier to deviate from his or her route or go home during business hours.  On July 23, 2009, Agent Peñon

conducted surveillance related to his investigation of Rodriguez in response to another complaint alleging that Rodriguez had parked his Postal Service truck in front of his house during his working hours.  Agent Peñon went to Rodriguez's residence and observed Rodriguez park his Postal Service truck there, enter the residence, and then leave the residence in the Postal Service truck. Rodriguez's residence is not located on his route.

On July 29, 2009, Peñon responded to another complaint about Rodriguez's conduct and went to the area of Rodriguez's residence.  There he observed Rodriguez's Postal Service truck parked in front of his residence.  Agent Peñon took photographs of the Postal Service truck, then approached the truck in his own vehicle and took photographs documenting that the door was open and the mail inside the Postal Service truck was unsecured.  As Agent Peñon drove away from the Postal Service truck, he observed Rodriguez running toward the truck.  Rodriguez entered the Postal Service truck and began to follow Agent Peñon. Rodriguez eventually pulled up beside Agent Peñon's car, shouting questions out his open window about why Agent Peñon was videotaping him.  Agent Peñon responded that he was a federal agent for the OIG and that Rodriguez was under investigation.  Agent Peñon then showed Rodriguez his badge and government credentials.

After Agent Peñon identified himself to Rodriguez as a federal agent, Rodriguez used his Postal Service truck to cut off

Agent Peñon's vehicle and force Agent Peñon to stop.  Rodriguez then stated that he had permission from his supervisor to deviate from his route to go to his residence and attend a medical appointment.  Rodriguez had, in fact, been granted permission by his supervisor to visit a doctor's office located on his route.  He had not, however, been granted permission to visit his residence. Rodriguez claims that he had to go to his house to get some x-rays to take to the doctor's office.

After both he and Rodriguez had pulled over, Agent Peñon instructed Rodriguez to park his vehicle so that the two could clear up the situation by contacting Rodriguez's supervisor. After Agent Peñon exited his vehicle and approached the Postal Service truck, Rodriguez got out and shouted at Agent Peñon that he was not a "God damn" inspector.  Agent Peñon again identified himself as an agent with the OIG and showed his credentials to Rodriguez.  Rodriguez was speaking to someone on his mobile phone, yelling that Agent Peñon was an "imposter inspector."

While Agent Peñon attempted to determine their exact location and call for assistance from other agents, Rodriguez ran to his Postal Service truck and tried to start the vehicle.  Agent Peñon moved to the Postal Service truck and tried to keep Rodriguez from turning on the ignition.  Rodriguez then let go of the keys which were in the ignition and punched Agent Peñon in the chest five to ten times while telling Agent Peñon that he was going to

eat Agent Peñon.   One of the punches knocked Agent Peñon to the ground.   On his hands and knees, Agent Peñon saw Rodriguez reaching into a tub as though he was going to pull out an object.   At that point, Agent Peñon drew his gun and instructed Rodriguez not to move, put his hands behind his head, and get down on his knees.

During this exchange between Agent Peñon and Rodriguez, a local resident, Rigoberto Rosado-Villanueva ("Rosado"), had come out of his residence.   Upon observing the confrontation, Rosado called the Postal Service letter carrier that usually delivered his mail, Michael Rivera ("Rivera"), to inform him of the situation.   After Agent Peñon drew his gun, Rodriguez grabbed Rosado and appeared to use him as a shield.   Agent Peñon then put down his firearm, used his badge and credentials to identify himself to Rosado as a federal agent, and explained that Rodriguez was under investigation.   Agent Peñon then started calling Postal Service Police Officers for assistance.   Rodriguez eventually let go of Rosado and ran away from Agent Peñon.   Rosado then ran into Rivera at the end of the street and told him that Agent Peñon had identified himself as an OIG inspector.   Agent Peñon shouted out for someone to call 911.   Apparently someone did call for emergency assistance, as Puerto Rico Police Officers arrived shortly after.   Agent Peñon did not witness Rodriguez being taken into custody by the police.

After the incident, Agent Peñon went to his cardiologist, Dr. David Storer, to be examined for chest pain in the area where he was punched by Rodriguez.  Dr. Storer observed abrasions on Agent Peñon's hand and redness on his chest. Dr. Storer instructed Agent Peñon to go to the emergency room at Auxilio Mutuo Hospital, where another doctor, Dr. Carrasquillo, examined him and prescribed two muscle relaxers.  Agent Peñon testified at trial that he still had a scar on his chest from the injuries inflicted by Rodriguez.

### 2. Sufficiency of the Evidence pursuant to Fed.R.Crim.P. 29

A court may enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  Fed.R.Crim.P. 29(a).  A defendant may move the court for a judgment of acquittal after the close of the government's case or at the close of all evidence.  Id.  Courts may reserve their decision on the motion, submit the case to the jury, and decide upon the motion before or after the jury returns a verdict of guilty.  Fed.R.Crim.P. 29(b).  A defendant may move for judgment of acquittal within seven days after a guilty verdict or after the discharge of the jury, whichever is later.  Fed.R.Crim.P. 29(c)(1). In this case, Rodriguez timely filed motions for extension of time and complied with the extended deadline by filing his motion on December 16, 2009.

In reviewing a motion for judgment of acquittal, courts must consider the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." U.S. v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted). This standard requires the resolution of all evidentiary disputes and credibility questions in favor of the government; the Court must also draw all reasonable inferences in favor of the government's case. Id. Thus, the jury's verdict stands unless the evidence could not have persuaded a rational trier of fact of the defendants' guilt beyond a reasonable doubt. U.S. v. Soler, 275 F.3d 146, 151 (1st Cir. 2002) (citing Lara, 181 F.3d at 200). The Court assesses only the admissible evidence at trial in applying the sufficiency standard. U.S. v. Aviles-Colon, 536 at 13.

"To commit a violation of 18 U.S.C. § 111(a), the defendant must (1) forcibly; (2) assault, resist, oppose, impede, intimidate, or interfere with; (3) a designated federal officer; (4) while engaged in or on account of the performance of official duties. In addition, the defendant must (5) have the intent to do the acts specified." United States v. Charles, 456 F.3d 249, 255 (1st Cir. 2006) (citing United States v. Arrington, 309 F.3d 40, 44 (D.C. Cir. 2002)). Rodriguez asserted the defense of "self-

defense", thus requiring the government additionally to prove beyond a reasonable doubt that either:  (1) Rodriguez knew that Peñon was a federal officer; or (2) Rodriguez used excessive force beyond that which would be justifiable self defense against an individual who was not a federal officer.  See Perkins, 488 F.2d at 655; Wilk, 572 F.3d at 1238.

Rodriguez argues that there was insufficient evidence to establish beyond a reasonable doubt that: (1) Rodriguez forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with Agent Peñon; (2) Agent Peñon was engaged in his official duties at the time of the confrontation; (3) Rodriguez acted knowingly and intentionally; (4) Rodriguez knew Agent Peñon was a federal officer; and (5) Rodriguez acted with excessive force.  (See Docket No. 79)  Rodriguez concedes that his actions involved physical contact and that Agent Peñon is an officer of the United States.[5]

### 3.   Forcible   Assault,   Resistance,   Opposition, Impediment, Intimidation, or Interference

---

[5] Plaintiff also argues that there are inconsistent statements and credibility issues regarding Agent Peñon.  (Docket 79 at 33.)  The inconsistencies pointed to by Rodriguez occur between Agent Peñon's testimony and the testimony of other witnesses, not between different statements of Agent Peñon.  Thus, his entire argument is based on credibility issues that must be resolved in favor of the government pursuant to the analysis under Rule 29.  See Lara, 181 F.3d at 200.  For that reason, the Court does not address Rodriguez's arguments regarding the credibility of Agent Peñon.

Rodriguez argues that the government presented insufficient evidence at trial to prove beyond a reasonable doubt that Rodriguez forcibly assaulted Peñon. (Docket No. 79 at 4) He cites the testimony from Agent Peñon, Rosado, and Rodriguez. At most, this testimony involves a credibility issue, which must be resolved in favor of the government under Rule 29 analysis.

In the cited testimony, Agent Peñon states that Rodriguez punched him in the chest five to ten times. (Docket No. 79 at 5; Docket No. 65 at 69) Rosado states that he could not see, due to his point of view at the time of the confrontation, anything aside from Peñon and Rodriguez struggling over the key to the Postal Service truck. (Docket No. 79 at 7; Docket No. 73 at 16-17) Rodriguez states that he did not assault Peñon in any way. (Docket No. 79 at 8; Docket No. 66 at 121) Thus, the resolution of whether Rodriguez forcibly assaulted Agent Peñon depends on the credibility of Agent Peñon's and Rodriguez's respective stories regarding what occurred inside the Postal Service truck.

The government also presented the testimony of Dr. Storer, who examined Agent Peñon shortly after the confrontation between Rodriguez and Peñon. Dr. Storer testified as to Agent Peñon's injuries and stated that he observed abrasions on Agent Peñon's hand and redness on his chest where Agent Peñon claimed Rodriguez punched him. While Dr. Storer states that he could not tell specifically what caused the injuries, their

existence provides at least some corroboration for Agent Peñon's testimony.  Even aside from the medical evidence provided by the government, the inconsistency between Agent Peñon and Rodriguez's respective testimonies is insufficient to overturn a jury's verdict pursuant to Rule 29.  See Soler, 275 F.3d at 151; Lara, 181 F.3d at 200.

### 4.   Engaged in Official Duties

Rodriguez's entire argument that Agent Peñon was not engaged in his official duties at the time of the confrontation between himself and Agent Peñon is centered on whether Agent Peñon's conduct was authorized or constitutional.  Addressing whether Agent Peñon was acting in the scope of what he was employed to do, Rodriguez argues that Agent Peñon had no authority to arrest or detain Rodriguez, citing the Fourth Amendment of the United States Constitution prohibiting unreasonable searches and seizures. (Docket No. 79 at 15-16)  Rodriguez separately argues that Agent Peñon was engaged in a personal frolic when he proceeded beyond what, according to Rodriguez, Agent Peñon was authorized to do. (Docket No. 79 at 17-20)  Both arguments confuse the issue of whether Agent Peñon's conduct was authorized by the probable cause requirement of the Fourth Amendment with the issue of whether Agent Peñon was engaged in his official duties.

The First Circuit Court of Appeals has clearly stated that "whether a federal officer is so engaged [in his or her

official duties] 'does not turn on whether the law being enforced
is constitutional or applicable to the defendant, or whether the
levy order being enforced was validly obtained; rather it turns on
whether the federal officer is 'acting within the scope of what
[he] [is employed to do . . . or is engaging in a personal frolic
of his own.'" Troy, 583 F.3d at 24.  In United States v. Troy, 583
F.3d 20, 25 n.3 (1st Cir. 2009), the First Circuit Court of Appeals
stated that the "scope of [a federal officer's] 'official duties'
for the purposes of [18 U.S.C. § 111 is not] limited to conduct
within [that officer's] constitutional authority."    Thus,
Rodriguez's arguments which frame the scope of Agent Peñon's
employment and whether he engaged in a personal frolic in terms of
constitutional authorization are misplaced in an analysis of
whether Agent Peñon was engaged in his official duties at the time
of the confrontation between Rodriguez and Agent Peñon.

          The evidence presented at trial showed that the OIG
had assigned Agent Peñon to investigate complaints made against
Rodriguez.  In the course of his duties, Agent Peñon is authorized
to make arrests.  While Agent Peñon was investigating Rodriguez,
Rodriguez confronted Agent Peñon, forced him to stop his official
vehicle, and explained that he had authorization to deviate from
his Postal Service route.  Agent Peñon instructed Rodriguez to park
his Postal Service truck so that the issue could be resolved by
calling Rodriguez's supervisor.  Rodriguez then began shouting at

Agent Peñon.  While Agent Peñon attempted to call for assistance to resolve the situation with Rodriguez, Rodriguez ran to his truck to leave the area.  Agent Peñon then attempted to stop Rodriguez from starting his truck, at which point Rodriguez punched Agent Peñon in the chest five to ten times.

It appears clear from the record that Agent Peñon was engaged in his official duties, i.e., investigating Rodriguez as a result of complaints that Rodriguez had been deviating from his route.  Rodriguez's argument that Agent Peñon's actions were not within his constitutional authority has no bearing on the question of whether Agent Peñon was acting in the scope of his employment or engaging in a personal frolic.  See Troy, 583 F.3d at 24-25.  Accordingly, the Court finds sufficient evidence in the record to support a rational jury's conclusion that Agent Peñon was engaged in his official duties at the time of the confrontation between Rodriguez and him.

### 5.   Mental State and Self Defense

Rodriguez argues that there was insufficient evidence to prove beyond a reasonable doubt that he knowingly and intentionally assaulted Agent Peñon.  He states that "[h]is mind was set on leaving the area, not on assaulting Agent Peñon." (Docket No. 79 at 21)  This argument addresses Rodriguez's mental state and is therefore intertwined with Rodriguez's arguments regarding self defense.  See  Perkins, 488 F.2d at 654 (holding

that a self-defense argument based on ignorance of official status attacks the mental state necessary for a conviction under 18 U.S.C. § 111).  The Court proceeds to consider said arguments together. All of Rodriguez's arguments, however, find insufficient support from the evidence in the record when taken in the light most favorable to the government.

The First Circuit Court of Appeals has held that the mental state necessary to convict pursuant to 18 U.S.C. § 111 "would obviously be present in conduct which is unlawful itself, i.e., an intentional assault." United States v. Perkins, 488 F.2d 652, 654 (1st Cir. 1973).  The First Circuit Court of Appeals has also held, however, that where "a defendant who in good faith, because of ignorance of the officer's identity, believes that he is acting in lawful defense of his person or property and uses no more than reasonable force in effectuating that purpose, . . . the defendant would lack" the criminal intent necessary for a conviction under 18 U.S.C. § 111.

Agent Peñon testified that Rodriguez punched him in the chest five to ten times.  The only conflicting testimony regarding Rodriguez's actions inside the Postal Service truck comes from Rodriguez himself.  Much like the issue of whether Rodriguez forcibly assaulted Agent Peñon, the issue of whether he did so intentionally boils down to credibility, i.e., which version of the story the jury found more believable or trustworthy, and must be

resolved in favor of the government under Rule 29.  See Lara, 181 F.3d at 200.  Considering the previously mentioned corroborating medical evidence from Dr. Storer that Agent Peñon had indeed been injured in the chest at the time of the confrontation, the evidence presented at trial had "sufficient bite" to allow the jury to find that the government proved beyond a reasonable doubt that Rodriguez intentionally assaulted Agent Peñon.  See id.

Such a finding would be sufficient to sustain a conviction under 18 U.S.C. § 111 unless the government failed to overcome Rodriguez's assertion of self-defense by proving beyond a reasonable doubt that Rodriguez knew Agent Peñon's official status or acted with excessive force.  See Perkins, 488 F.2d at 654-55. Rodriguez claims that he was unaware of Agent Peñon's official status at the time of the confrontation with Agent Peñon.  (Docket No. 79 at 25-31)  Rodriguez argues that his ignorance is supported by the fact that Agent Peñon was not wearing a uniform and traveled in an unmarked car.  Id.  Rodriguez further argues that despite the fact that Agent Peñon identified himself to Rodriguez as a federal agent, he did not actually believe that Agent Peñon was a federal agent.  Id.

Resolving all credibility issues in favor of the government, the evidence presented at trial shows that Agent Peñon identified himself to Rodriguez with his federal badge and credentials on at least two separate occasions.  The first

identification occurred when Rodriguez shouted questions about Agent Peñon's identity from his Postal Service truck.  At that point Agent Peñon explained that Rodriguez was under investigation.  Agent Peñon identified himself a second time after Rodriguez expressed his doubt as to Agent Peñon's official status.  Although Agent Peñon may not have been wearing an official uniform or driving an official vehicle marked as such, it is quite clear from the evidence presented at trial that he identified himself to Rodriguez as an OIG special agent and showed Rodriguez his federal badge and credentials.

Rodriguez claims that Agent Peñon's testimony that he overheard Rodriguez on the phone referring to him as an "imposter inspector" demonstrates that Rodriguez did not know that Agent Peñon was a federal agent.  (Docket No. 79 at 31)  In order to overturn a jury's verdict pursuant to Rule 29, Rodriguez must show that the evidence presented at trial could not have persuaded a rational trier of fact of the defendants' guilt beyond a reasonable doubt.  See Soler, 275 F.3d at 151.  With regard to the issue of whether Rodriguez knew of Peñon's official status, testimony that Rodriguez referred to Agent Peñon as an "imposter inspector" simply does not meet that burden in light of the evidence that Agent Peñon twice identified himself as a federal

agent and explained that Rodriguez was under investigation.[6]  See United States v. Arcuri, 193 Fed. Appx. 618, 620 (7th Cir. 2006) (holding victims' self identification to a defendant as police while displaying badges sufficient to prove knowledge of official status).

## CONCLUSION

For the reasons discussed above, defendants' motion for a new trial, (Docket No. 78), and motion for a judgment of acquittal, (Docket No. 79), are **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, February 19, 2010.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE

---

[6] Having concluded that there was sufficient evidence to prove beyond a reasonable doubt that Rodriguez knew of Agent Peñon's official status, it is unnecessary also to consider Rodriguez's claim that there was insufficient evidence to support a finding of excessive force.  See Perkins, 488 F.2d at 655; Wilk, 572 F.3d at 1238 (holding that government sustains its burden of disproving self-defense by proving either defendant's knowledge of the victim' official status **or** excessive force).